# EXHIBIT 2

Amicus Brief

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| ROBERT STARBUCK NEWSOM, aka ROBBY STARBUCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SCOTT GOLDEN, in his official capacity as | ) |
| Chairman of the Tennessee Republican Party; | ) CASE NO. 3-22-CV-00318 |
| the TENNESSEE REPUBLICAN PARTY; | ) |
| MARK GOINS, in his official capacity as | ) |
| Coordinator of Elections – Office of the | ) |
| Tennessee Secretary of State; and TRE | ) |
| HARGETT, in his official capacity as | ) |
| Tennessee Secretary of State, | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF *AMICUS CURIAE* MORGAN ORTAGUS IN SUPPORT OF ROBERT STARBUCK NEWSOM'S MOTION FOR TEMPORARY RESTRAINING ORDER OR IN THE ALTERNATIVE A PRELIMINARY INJUNCTION**

Morgan Ortagus ("Ortagus"), by and through her counsel, Dickinson Wright PLLC, submits this brief in support of Plaintiff Robert Starbuck Newsom's Motion for Temporary Restraining Order or in the Alternative a Preliminary Injunction.

## I.      INTRODUCTION

The United States Supreme Court has determined that the power to fix the qualifications of candidates for primary elections is a state function that may make a political party's action the action of the state. *Smith v. Allwright*, 321 U.S. 649, 663 (1944). Here, the State of Tennessee delegated its authority to the Tennessee Republican Party ("TRP") to determine what candidates may appear on the ballot for a primary election. The TRP then exercised that delegated authority

to improperly exclude Plaintiff Robert Starbuck Newsom aka Robby Starbuck ("Starbuck") and *amicus curiae* Ortagus and directed the State of Tennessee to remove them from the ballot.

This Court should conclude that the actions of the TRP are state actions such that the TRP may be held liable for violating the United States Constitution (the "Constitution"). If the TRP's actions are determined not to be state action, there would be nothing to prevent the TRP from excluding potential candidates based on them being the member of a protected class, a proposition the Supreme Court specifically rejected in *Allwright*.

After concluding that the TRP's conduct is state action, this Court should find that Starbuck is likely to succeed on the merits of this case. State political parties cannot enforce unconstitutional requirements regarding the qualifications to serve as a member of the United States Congress. Instead, the Qualifications Clause of the Constitution sets forth the qualifications to serve in Congress. U.S. Const. Art. 1, § 2. Notably, the Constitution vests each house of Congress with the "*sole authority*" to judge the qualifications of members. U.S. Const. Art. 1 § 5 (emphasis added). The State cannot bypass these Constitutional limitations by delegating authority to the TRP regarding which candidates may appear on the primary ballot. Based on the facts at bar, it is undisputed that the TRP removed Starbuck and *amicus curiae* Ortagus from the ballot for reasons that violate the Qualifications Clause. The Court should not permit such Constitutional shenanigans, and should instead grant Starbuck's request for injunctive relief.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

On February 2, 2022, Tennessee State Senator Frank Nicely introduced Senate Bill 2616 ("SB 2616") to block several Republican candidates from running for the newly created fifth Congressional District. (Compl. ¶ 24, ECF No. 1.) Senator Nicely was motivated by a desire to

block Starbuck and Ortagus from the election because he considers them "carpetbaggers."[1] *Id*. ¶ 7. Senator Nicely also wanted to assist his friend, and former Speaker of the Tennessee General Assembly, Beth Harwell, with her campaign for the TRP's nomination in the fifth Congressional District. *Id*. ¶¶ 7, 24. Finally, beyond mere political chicanery, Senator Nicely made statements which call into question whether there were other improper motives in introducing SB 2616. Despite the fact that former President Donald Trump endorsed Ortagus' candidacy, Senator Nicely dismissed President Trump's endorsement, arguing: "I don't think Trump cares one way or the other [about Ortagus]… I think Jared Kushner – He's Jewish, she's Jewish – I think Jared will be upset [about SB 2616 and Ortagus being ineligible to run]. Ivanka will be upset. I don't think Trump cares." *Id*. at 12 n.3. As the *Wall Street Journal* explained, "Ms. Ortagus is Jewish, and the innuendo here is not subtle." *The Tennessee GOP Empire Strikes Back*, WALL STREET JOURNAL, April 20, 2022.

On March 23, 2022, the Tennessee General Assembly passed SB 2616, which ultimately codified into law certain qualifications that candidates must meet to qualify as a candidate to represent Tennessee in either the United States Senate or the House of Representatives. (Compl. ¶ 24, ECF No. 1.) SB 2616 states: "In order to qualify as a candidate in a *primary election* for the United States senate [sic] or for member of the United States house of representatives [sic], a person shall meet the residency requirements for state senators and representatives contained in the Tennessee constitution." SB 2616, **Exhibit 1** (emphasis added). Further: "[t]his act takes effect upon becoming a law, the public welfare requiring it." *See Id*.

---

[1] A "carpetbagger" is derogatory term that was used to describe an individual from the North who moved to the South after the civil war. It is now used to describe a politician who takes up residence in a place and runs for office without having strong ties to the area. https://www.dictionary.com/browse/carpetbagger (last visited May 7, 2022).

3

Under the Tennessee Constitution: "No person shall be a representative unless he shall be a citizen of the United States, of the age of twenty-one years, and shall have been a citizen of this state for three years, and resident in the county he represents one year, [sic] immediately preceding the election." Tenn. Const. Art. 2, § 9. Regarding State Senators, "No person shall be a senator unless he shall be a citizen of the United States, of the age of thirty years, and shall have resided three years in this state, and one year in the county or district, immediately preceding the election." Tenn. Const. Art. 2, § 10. Thus, per SB 2616, these requirements now apply to candidates seeking to represent Tennessee in either the United States Senate or the United States House of Representatives.

On March 31, 2022, three Tennessee residents who support Ortagus' candidacy filed suit seeking a declaratory judgment that SB 2616 was unconstitutional because it violated the Qualifications Clause of the Constitution. (Compl. ¶ 26, ECF No. 1.)

"Independent and primary candidates for any office to be filled at the regular November election for which a primary is required to be held at the regular August election shall qualify by filing such candidates' nominating petitions no later than twelve o'clock (12:00) noon, prevailing time, on the first Thursday in April." Tenn. Code Ann. §2-5-101(b). In 2022, the qualifying deadline for primary candidates running for Congress to file their petitions was April 7, 2022.

SB 2616 became law on April 13, 2022, *after* the April 7, 2022 filing deadline for congressional candidates to be on the 2022 ballot. (Compl. ¶ 28, ECF No. 1.) The Tennessee Secretary of State's Office confirmed that SB 2616 was inapplicable to candidates who had already filed to appear on the ballot in the 2022 elections. *Id*., ¶ 28.

Undeterred by the fact that SB 2616 could not be applied retroactively, the TRP took it upon itself to enforce this unconstitutional state law. On April 11, 2022, the TRP directed the

4

Coordinator of Elections for the State of Tennessee to remove several candidates from the Republican August 2022 primary ballot, including Robby Starbuck and Morgan Ortagus. (Declaration of Scott Golden ("Golden Dec.), at Exhibit B, ECF No. 26-1.)

On April 19, 2022, the TRP held a vote to determine whether Starbuck and Ortagus should be restored to the ballot. (Golden Decl. ¶ 6, ECF No. 26-1.) In so doing, the TRP admits that it was acting in accordance with the authority granted to it by the State of Tennessee. *Id*. (citing Tenn. Code Ann. § 2-5-204(b)(2)(B)).

On April 21, 2022, the TRP sent a letter to the Coordinator of Elections for the State of Tennessee that directed the State to remove several candidates, including Starbuck and Ortagus, from the ballot in the August Republican primary. (ECF 26-1, at p. 11.)

At least one TRP State Executive Committee member, Angie McClanahan, admitted that she voted to remove Starbuck and Ortagus from the primary ballot "*because of* the new state residency law." (ECF 27-2.) (Emphasis added.)

On May 2, 2022, Starbuck filed this action, which seeks Declaratory and Injunctive Relief. (ECF No. 1.) Starbuck also filed his Motion for Temporary Restraining Order or in the Alternative a Preliminary Injunction. (ECF Nos. 7, 8 and 11.)

On May 5, 2022, this Court scheduled a hearing on Starbuck's Motion for May 10, 2022, at 9:00 a.m. (ECF No. 23.) In its Order, the Court also directed Starbuck to address two issues: "Plaintiff's filings shall specifically address the question of state action, as well as whether he has a property interest in being placed on the ballot." *Id*. ¶ 3.

*Amicus curiae* Ortagus now files this brief in an effort to assist this Court in deciding some of the important issues presently under consideration.

### III.   DISCUSSION

42 U.S.C. § 1983 creates a civil cause of action against a person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." There are two requirements under this statute: (1) the conduct at issue must have been committed by a person acting under color of law, and (2) the conduct must have deprived a person of his rights secured by the Constitution and laws. *Id.*; *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). "If the challenged conduct . . . constitutes state action. . . , then that conduct was also action under color of state law and will support a suit under § 1983." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982).

In this case, the TRP's actions satisfy both requirements of § 1983. TRP's conduct in deciding who may appear on the primary ballot and directing the State of Tennessee regarding the same is unquestionably state action in accordance with binding Supreme Court precedent. Moreover, Starbuck is likely to prevail on his claims in this case. At a minimum, Starbuck is likely to prevail on his first claim because a political party cannot enforce unconstitutional qualifications on a candidate who desires to run for federal political office and then evade responsibility because it claims to be acting as a "private entity."

### A.   TRP's Conduct in this Case is Unquestionably "State Action"

The TRP acted under color of state law by precluding Starbuck and Ortagus from appearing on the primary ballot. Indeed, the TRP was acting in accordance with its statutory authority delegated by the State of Tennessee when it directed the Coordinator of Elections as to who would appear on the primary ballot.

In *Smith v. Allwright*, the United States Supreme Court held that a "statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election." 321 U.S. 649, 663 (1944). Texas law provided that "every person, if certain other requirements are met. . . , qualified by residence in the district or county 'shall be deemed a qualified elector.'" *Id.* at 652-53. In 1932, the Texas Democratic Party passed a resolution restricting its membership to "white citizens of the State of Texas." *Id.* at 668. Pursuant to this resolution, the Texas Democratic Party refused to permit Lonnie Smith, an African-American, to vote in the primary election to nominate Democratic candidates for the United States Congress. *Id.* Smith subsequently brought suit against precinct election and associate election judges. *Id.* at 650-51. The district court denied the relief sought, and the court of appeals affirmed. *Id.* at 652.

The Supreme Court analyzed the question of whether the Texas Democratic Party's treatment of Smith constituted state action. The Supreme Court noted that "[t]he Fourteenth Amendment forbids a state from making or enforcing any law which abridges the privileges or immunities of citizens of the United States and the Fifteenth Amendment specifically interdicts any denial or abridgement by a state of the right of citizens to vote on account of color." *Id.* at 657. The Texas Democratic Party took the position that it is a "voluntary organization" that "is free to select its own members and limit to whites participation in the party primary." *Id.* According to the Texas Democrats, primaries "are political party affairs, handled by party not government officers." *Id.*

The Supreme Court rejected the Texas Democratic Party's argument, stating that "state delegation to a party of the power to fix the qualifications of primary elections is delegation of a

7

state function that may make the party's action the action of the state." *Id*. In Texas, "[p]rimary elections are conducted by the party under state statutory authority." *Id*. at 663. As a result, the Court determined that any discrimination that occurs in relation to the primary becomes state action. *Id*. at 664 ("If the state requires a certain electoral procedure, prescribes a general election ballot made up of party nominees so chosen and limits the choice of the electorate in general elections for state offices, practically speaking, to those whose names appear on such a ballot, it endorses, adopts and enforces the discrimination against Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary."). Further, the Supreme Court stated that "[t]his grant to the people of the opportunity for choice is not to be nullified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election." *Id.* Regardless of whether a political party is precluding someone from voting or precluding someone from appearing on the ballot, it is state action by virtue of the delegation of authority in connection with the primary election.

The Supreme Court subsequently reiterated this holding in *California Democratic Party v. Jones*:

"[W]hen a State prescribes an election process that gives a special role to political parties, it 'endorses, adopts and enforces the discrimination against Negroes' that the parties (or, in the case of the Jaybird Democratic Association, organizations that are 'part and parcel' of the parties), bring into the process—so that the parties' discriminatory action becomes state action under the Fifteenth Amendment."

530 U.S. 567, 573 (2000); *see also New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008) (stating that a political party's "rights are circumscribed, however, when the State gives the party a role in the election process—as New York has done here by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then, for example, the party's racially discriminatory action may become state action that violates the

8

Fifteenth Amendment."); *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978) ("While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.").

In this case, the State of Tennessee has delegated authority to political parties with respect to primary elections. Tenn. Code Ann. § 2-13-102. Indeed, Tennessee law requires each political party to have a state executive committee, which "shall perform the duties and exercise the powers required by this title for its party." Tenn. Code Ann. § 2-13-102(a)-(b). The State also gives the TRP the power to instruct the State as to which candidates can appear on the primary ballot. Tenn. Code Ann. § 2-13-104.

In accordance with its state-derived authority, the TRP directed the State of Tennessee to remove Starbuck and Ortagus from the primary ballot and thus deprive their access to the ballot. And, the Chairman of the Tennessee Republican Party admits that the TRP was acting under the color of state law when it made that decision. (Golden Decl. ¶ 3, ECF No. 26-1) ("The TRP, acting under the authority of Tenn. Code. Ann. ("TCA") §§ 2-13-104 and 2-5-204, properly determined that Robert Starbuck Newsom a/k/a Robby Starbuck ("Starbuck") is not a bona fide Republican under the bylaws of the TRP.").

Thus, just like the Texas Democratic Party in *Allwright*, the State of Tennessee delegated to TRP "the power to fix the qualifications of primary elections," which the Supreme Court has already determined is "a state function that may make the party's action the action of the state." *See Allwright*, 321 U.S. at 660.

In opposing Starbuck's Motion, Defendants seek to distinguish *Allwright* by arguing that the present case does not involve an allegation that Starbuck was subjected to discrimination based

on membership in a protected class. (ECF No. 16 at 9; ECF No. 17 at 10.) To support this argument, the State Defendants heavily rely on Judge Echols' decision in *Kurita v. State Primary Bd. of Tennessee Democratic Party*, No. 3:08-0948, 2008 WL 4601574, at *1 (M.D. Tenn. Oct. 14, 2008), aff'd, 472 F. App'x 398 (6th Cir. 2012). (State's Response in Opposition to Amended Motion for Preliminary Injunction, at pp. 9-10, ECF No. 16.)

Defendants' reliance on *Kurita* is misplaced. In *Kurita*, the Court attempted to distinguish *Allwright* as follows:

> The facts of this case can be distinguished from *Terry*, *Allwright*, and *Nixon*. This case does not concern invidious racial discrimination practiced by a political party against a suspect class at a primary election. Rather, this case is governed by the Supreme Court cases warning federal courts to avoid interference with the First Amendment associational rights of a political party when that party is engaged in the process of selecting its nominee for public office.

*Kurita*, 2008 WL 4601574, at *9. But this analysis is erroneous as it conflates the concept of "state action" with the separate issue of whether a constitutional violation occurred.

As discussed above, there are two requirements under 42 U.S.C. § 1983: (1) the conduct at issue must have been committed by a person acting under color of law; and (2) the conduct must have deprived a person of his rights secured by the Constitution and laws. By stating that the *Kurita* case did not involve racial discrimination, the Court only addressed the issue of whether there has been a deprivation of a right "secured by the Constitution and laws." But, this begs the question of whether the state political party acted "under the color of law," regardless of whether the conduct at issue was unconstitutional. In other words, a conclusion that there was no discrimantion has no bearing on the separate issue of whether there was a government action in the first place.

Further, whether something is "state action" does not depend on whether the conduct at issue is lawful. Thus, if the TRP has the power to fix qualifications for the primary election, it cannot be said that it is only acting as a state actor to the extent it *exceeds* constitutional

10

requirements. Instead, at its core, the concept of state action looks to whether the actor is acting in accordance with governmental authority. *See Lugar*, 457 U.S. at 937 ("Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.").

Thus, the Court in *Kurita* erred in suggesting that the conduct of a political party is only state action in the event it is discriminatory. It is the delegation of authority to make the decision, not the decision itself, that determines whether there is state action.

Any other conclusion would lead to absurd results. Take, for example, a situation in which the TRP explicitly stated that it decided to remove Ortagus from the ballot because she is Jewish or female. There is no question that such a discriminatory decision would constitute state action in accordance with *Allwright* as well as Judge Echols' opinion in *Kurita*. If the removal of a candidate from the ballot is state action when discriminatory, the exact same conduct of removing a candidate for non-discriminatory reasons would also necessarily constitute state action. In both instances, the actor is exercising authority derived from the state.

Finally, *Kurita* is also distinguishable from the present dispute because, in that case, the political party in question was *selecting* who the Tennessee Democratic Party's nominee would be for a particular state senate district following an election contest. The issue presented itself only after there was a determination that the election results were "incurably uncertain." *Kurita*, 2008 WL 4601574 at *1. In contrast, the issue here is simply who may *appear* on the ballot for Republican primary voters, which is a state-delegated function concerning primary elections. The Supreme Court's decision in *Flagg* articulates why this distinction is crucial: "The doctrine [set forth in *Terry*, *Allwright*, and *Nixon*] does not reach to all forms of political activity, but

11

encompasses only state-regulated elections or elections conducted by organizations which in practice produce 'the contested choice of public officials.'" *Flagg Bros., Inc.*, 436 U.S. at 158.

Based on the foregoing, there is no question that the State delegated to the TRP "the power to fix the qualifications of primary elections," which the Supreme Court in *Allwright* determined is a "state function that may make the party's action the action of the state." 321 U.S. at 660. Thus, the TRP unambiguously engaged in state action; the only remaining question is whether a constitutional violation occurred.

**B.** **A Political Party Such as TRP Cannot Enforce an Unconstitutional Statute on Behalf of the State**

Given that TRP's conduct in this case satisfies the "state action" requirement of § 1983, the next question is whether the TRP deprived Starbuck "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. This *amicus* brief will limit its discussion to Starbuck's First Claim for Relief, which asserts a violation of the Qualification Clause of the Constitution, U.S. Const. Art. 1 § 2; U.S. Const. Art. 1 § 5.

**1.** **The Qualifications Clause of the Constitution**

Article I, Section 2 of the Constitution states: "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S. Const. art. 1, § 2. Additionally, Section 5 of Article I confirms that "Each House shall be the Judge of the Elections . . . and Qualifications of its own Members." U.S. Const. Art. 1 § 5. Thus, the Constitution vests each house of Congress with the "***sole authority*** . . . to judge the elections, returns and qualifications of its members." *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) (emphasis added). However, the power granted to each House of Congress

to judge the "qualifications of its own members," does not include the power to alter or add to the qualifications outlined in the Constitution's text. *Powell v. McCormack*, 395 U.S. at 540 (1995).

The Constitution does not empower state legislatures to infringe upon Congress' exclusive authority to judge the qualifications of its members. *Roudebush v. Hartke*, 405 U.S. 15, 19 (1972). The Supreme Court has ruled that constitutional qualifications for congressional service are "fixed" and may not be supplemented. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 816 (1995). In fact, states "have no authority to change, add to, or diminish, the requirements for congressional service enumerated in the Qualifications Clauses." *U.S. Term Limit*s, 514 U.S. at 816 (citations omitted).

In *U.S. Term Limits*, the United States Supreme Court rejected the typical balancing test that previous courts had used when a state implemented a ballot access provision. 514 U.S. at 835; *see also Schaefer v. Townsend*, 215 F.3d 1031, 1038 (9th Cir. 2000) (interpreting *U.S. Term Limits* test regarding the Qualifications Clause). Rather than employing a test such as strict scrutiny, intermediate review, or rational basis review, the Supreme Court only examined whether a certain law: (1) creates an absolute bar to candidates who would otherwise qualify under the Qualifications Clause, or (2) if the provision has the likely effect of handicapping otherwise qualified candidates and has the sole purpose of creating additional qualifications indirectly. *U.S. Term Limits*, 514 U.S. at 836. If the answer is yes to either of these questions, the law is unconstitutional.

In ruling on *U.S. Term Limits*, the Supreme Court affirmed the Arkansas Supreme Court's ruling that states "have no authority to change, add to, or diminish, the requirements for congressional service enumerated in the Qualifications Clauses." *U.S. Term Limits,* 514 U.S. at 816 (citations omitted). The United States Supreme Court rejected Arkansas' that argument that a state could add its own qualifications because "the power to add qualifications is not within the

original powers of the states, and thus is not reserved by the Tenth Amendment." *Id.* at 800 (quotations omitted). The Supreme Court emphasized that "the Framers envisioned a uniform national system, rejecting the notion that the Nation was a collection of States, and instead creating a direct link between the National Government and the people of the United States." *Id.* at 803. The Supreme Court held that a "fundamental principle of our representative democracy is that . . . the people should choose whom they please to govern them." *Id.* at 819 (citations and quotations omitted).

Using the reasoning found in *U.S. Term Limits*, the Ninth Circuit *reversed* a district court's ruling and held that a California law that essentially imposed a residency requirement of one year was unconstitutional. *Schaefer*, 215 F.3d at 1038. Notably, the statute at issue in *Schaefer* was even less restrictive than the Tennessee statute:

> Unless otherwise specifically provided, no person is eligible to be elected or appointed to an elective office unless that person is a registered voter and otherwise qualified to vote for that office at the time that nomination papers are issued to the person or at the time of the person's appointment.

Cal. Elec. Code § 201 (West). The *Schaefer* Court emphasized that the Constitution did not grant states the authority to add requirements for members of the United States Congress. *Id.* The Ninth Circuit held: "the Framers intended the Constitution to be the exclusive source of qualifications for Members of Congress, and that the Framers thereby 'divested' States of any power to add qualifications." *Id.* at 1035 (quotations omitted). The Ninth Circuit ruled that the Framers of the Constitution "explicitly rejected any requirement of in-state residency before the election." *Id.* at 1036. Accordingly, "requiring the candidates [to] establish in-state residency well in advance of the election is not so justified." *Id.* at 1037. Furthermore, the Ninth Circuit ruled that any type of law that a state imposes that does not regulate procedure nor requires some initial showing of support must be declared unconstitutional. *Id.* The "California residency requirement has the likely

14

effect of handicapping the class of nonresident candidates who would otherwise meet the requirements of the Qualifications Clause." *Id.* at 1039. Therefore, the California law was unconstitutional because it "require[d] candidates for the state's delegation of the House of Representatives to reside in the state prior to the election." *Id.*

Similarly, the Tenth Circuit struck down a Colorado law that required candidates to be Colorado residents for at least 30 days prior to an election. *Campbell v. Davidson*, 233 F.3d 1229, 1235 (10th Cir. 2000).

### 2. Tennessee's Imposition of Additional Qualifications on Candidates is a Violation of the Qualifications Clause

In this case, the TRP's imposition of additional qualifications for candidates to run for office violates the Qualifications Clause of the Constitution. Here, the Tennessee General Assembly, led by State Senator Nicely, was successful in passing SB 2616 to prevent Starbuck and Ortagus from running in the election. However, when the Tennessee Secretary of State's Office confirmed that SB 2616 was not retroactive, TRP took it upon itself to enforce this unconstitutional state law. *See* Declaration of Cody Mitchell, ECF No. 27-2 (confirming that at least one member of the TRP State Executive Committee voted to remove Starbuck and Ortagus from the primary ballot "because of the new state residency law." The TRP's imposition of additional qualifications violates the Qualifications Clause given the TRP's exclusive role in determining who may appear on the Republican Party's primary ballot.

The State of Tennessee cannot get around the Qualifications Clause by delegating authority to the TRP to violate the Constitution. In *Nixon v. Condon*, 286 U.S. 73 (1932), Nixon, an African American, brought suit against judges of election of Texas for their refusal to permit him to vote in the primary based on his race. The Supreme Court previously struck down a Texas law that provided African Americans could not participate in a Democratic Party primary election. *Id.*

(citing *Nixon v. Herndon*, 273 U.S. 536 (1927)). After the Supreme Court struck down that statute, the State enacted a new statute giving the executive committees of political parties the authority to determine who shall be qualified to vote or participate in the political party. *Id.* The state executive committee of the Democratic Party then adopted a resolution that had the same effect as the unconstitutional state statute. *Id.*, 286 U.S. at 82.

In analyzing the issue, the Supreme Court stated that the new statute delegated authority to members of a political committee. *Id.*at 84. Specifically, the statute provided, in part, that "every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party." *Id*. at 82. The Democratic party contended that this new statute only restored to the members of the party the power to determine its own membership. *Id*. at 83.

The Supreme Court rejected the Democratic party's argument, concluding that the statute delegated state authority to a committee, as opposed to letting the party itself make a determination as to membership. *Id*. at 85. Based on this statutory delegation, the Court concluded that the actions of the state executive committee were actions of the state: "Whatever power of exclusion has been exercised by the members of the [state executive] committee has come to them, therefore, not as the delegates of the party, but as the delegates of the state." *Id*. at 85. And, in that case, the Court concluded that "Delegates of the state's power have discharged their official functions in such a way as to discriminate invidiously between white citizens and black." *Id*. at 89.

More recently, in *Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), the Fifth Circuit affirmed a district court's ruling that a de facto residency requirement for a candidate running for Congress was unconstitutional. The challenged Texas law allowed a party officer to

declare a primary winner ineligible if the winner did not fulfill all eligibility requirements 74 days prior to an election. *Id*. at 589. In *Benkiser*, a chairwoman for the Republican Party of Texas declared the primary winner—Tom Delay—ineligible because he lived in Virginia before the election. *Id*. This law was declared unconstitutional. The Fifth Circuit concluded: "There is no dispute that when Benkiser applied the ineligibility statute to DeLay she did so as a state actor." *Benkiser*, 459 F.3d at 589 n.9 (citations omitted) (emphasis added). This is precisely what has transpired here and should be the authority the Court relies on rather than *Kurita*.

## IV.    <u>CONCLUSION</u>

*Amicus curiae* Ortagus respectfully requests that this Court conclude the TRP's actions at issue in this case were under the color of law and constitute state action within the meaning of 42 U.S.C. § 1983. The State of Tennessee cannot bypass constitutional requirements by delegating its authority to the TRP. *Allwright*, 321 U.S. at 664 (citing *Lane v. Wilson*, 307 U.S. 268, 275 (1939)). Otherwise, a political party could be used as a vehicle to evade otherwise illegal constitutional restrictions under the veil of being "private action" not subject to judicial review. The Court should see through this charade. Starbuck is likely to prevail on his first claim for relief because he was removed from the primary ballot based on new requirements that are more onerous than those set forth in the United States Constitution. Based on the foregoing, Ortagus requests that the Court conclude that Starbuck is likely to prevail in this case and grant his Motion for Temporary Restraining Order or in the Alternative a Preliminary Injunction.

17

Respectfully submitted,

**DICKINSON WRIGHT PLLC**

_s/ Autumn L. Gentry_
Autumn L. Gentry #20766
424 Church Street, Suite 800
Nashville, TN 37219-2392
Tel:    615-244-6538
Fax:    844- 670-6009
agentry@dickinsonwright.com

_s/ Charles R. Spies_
Charles R. Spies _Pro Hac Vice_
District of Columbia Bar # 989020
1825 Eye Street, Suite 900
Washington, DC 20006
Tel:    202-466-5964
Fax:    844-670-6009
cspies@dickinsonwright.com

Attorneys for _Amicus Curiae_ Morgan
Ortagus

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on this 9th day of

May, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system

to all parties listed below. Parties may access this filing through the Court's electronic filing

system:

David A. Warrington
Michael A. Columbo
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 402
`        Alexandria, VA 22314
Tel:    703-328-5369
        415-433-1700
dwarrington@dhillonlaw.com
mcolumbo@dhillonlaw.com

18

Eric G. Osborne
Sherrard Roe Voight & Harbison, PLC
150 Third Avenue, South
Suite 1100
Nashville, TN 37201
Tel:    615-742-4200
Fax:    615-742-4539
eosborne@srvhlaw.com

Mark A. Carver
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37207-0207
Tel:    423-963-0701
Fax:    615-741-2009
acarver@srvhlaw.com

Joshua A. Mullen
Womble Bond Dickinson (US) LLP
2001 K Street, NW
Suite 400 South
Washington, DC 20006
Tel:    202-857-4522
Fax:    202-261-0034
Josh.Mullen@wbd-us.com

Alexander Stuart Rieger
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37207-0207
Tel:    615-741-2408
Fax:    615-532-5683
alex.rieger@ag.tn.gov

/s/ *Autumn L. Gentry*
Autumn L. Gentry

4882-4103-0174 v5 [101020-1]

19

# EXHIBIT 1

Senate Bill No. 2616



# *State of Tennessee*

## PUBLIC CHAPTER NO. 857

### SENATE BILL NO. 2616

**By Niceley, Walley, Bowling, Powers, Reeves, Rose**

Substituted for: House Bill No. 2764

By Wright, Mannis, Kumar, Weaver, Howell, Bricken, Sherrell, Leatherwood, Shaw, Hodges, Whitson, Hazlewood

AN ACT to amend Tennessee Code Annotated, Title 2, relative to the selection of candidates.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Title 2, Chapter 13, Part 2, is amended by adding the following as a new section:

In order to qualify as a candidate in a primary election for United States senate or for member of the United States house of representatives, a person shall meet the residency requirements for state senators and representatives contained in the Tennessee constitution.

SECTION 2. This act takes effect upon becoming a law, the public welfare requiring it.

SENATE BILL NO.  **2616**

PASSED:        **March 28, 2022**

_____

_____
RANDY McNALLY
*SPEAKER OF THE SENATE*

_____
CAMERON SEXTON, *SPEAKER*
*HOUSE OF REPRESENTATIVES*

APPROVED this ___13ᵗʰ___ day of ___April_____ 2022

_____
BILL LEE, *GOVERNOR*



# TENNESSEE SENATE

RUSSELL A. HUMPHREY
CHIEF CLERK

RANDY MCNALLY
LT. GOVERNOR
SPEAKER OF THE SENATE

April 13, 2022

The Honorable Tre Hargett
Secretary of State
State Capitol
Nashville, TN 37243-1102

Dear Secretary Hargett:

On February 28, 2022, the Senate of the One Hundred Twelfth General Assembly passed Senate Bill No. 2616 by a constitutional majority. On March 28, 2022, the House of Representatives of the One Hundred Twelfth General Assembly passed Senate Bill No. 2616 by a constitutional majority. Thereupon, the Bill was transmitted to and received by the Governor on April 1, 2022. The Governor returned the Bill on April 13, 2022, without his signature, along with the enclosed correspondence to the Speakers of the Senate and the House of Representatives informing them of his decision.

As the Governor did not return Senate Bill No. 2616 with his disapproval within ten (10) calendar days, excluding Sundays, after he received the Bill, Senate Bill No. 2616 becomes law without the Governor's signature pursuant to Article III, Section 18 of the Constitution of the State of Tennessee.

With best wishes, I am,

Sincerely yours,

Jordan G. Young
Chief Engrossing Clerk

RECEIVED

APR 25 2022

Secretary of State
Division of Publications

Case 3:22-cv-00318   Document 31-2   Filed 05/09/22   Page 24 of 25 PageID #: 404



**BILL LEE**

GOVERNOR
STATE OF TENNESSEE

April 13, 2022

The Honorable Randy McNally
Lieutenant Governor
425 Rep. John Lewis Way N., Suite 700
Nashville, TN 37243

The Honorable Cameron Sexton
Speaker, Tennessee House of Representatives
425 Rep. John Lewis Way N., Suite 600
Nashville, TN 37243

Dear Lieutenant Governor McNally and Speaker Sexton:

I write to inform you that I am letting SB 2616 / HB 2764 become law without my signature.

Respectfully,

Bill Lee