UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| ROBERT STARBUCK NEWSOM, | ) | |
|---|---|---|
| aka ROBBY STARBUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00318 |
| | ) | |
| SCOTT GOLDEN, in his official capacity | ) | |
| as Chairman of the Tennessee Republican | ) | |
| Party; the TENNESSEE REPUBLICAN | ) | |
| PARTY; MARK GOINS, in his official | ) | |
| capacity as Coordinator of Elections–Office | ) | |
| of the Tennessee Secretary of State; and | ) | |
| TRE HARGETT, in his official capacity as | ) | |
| Tennessee Secretary of State | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Robby Starbuck, whose formal name is Robert Starbuck Newsom, wants to be the next United States Representative for the Fifth Congressional District of Tennessee. To that end, Starbuck officially declared his candidacy on June 22, 2021, and has been vigorously campaigning as a Republican candidate ever since. However, unlike famous Mr. Smith who goes to Washington after being appointed by Governor Hubert Hopper to fill the shoes of Senator Samuel Foley, Starbuck can only go to Washington as a Congressman if his name is placed on the August 4, 2022 Republican primary ballot. Therein lies the rub and the basis for Starbuck's Verified Complaint (Doc. No. 1) and Amended Motion for Preliminary Injunction (Doc. No. 11).

### I. Background

A relatively recent transplant from California, Starbuck claims that he has been a Republican his entire life and very active in its affairs. On March 22, 2022, well before the state imposed April

7, 2022 deadline, he filed his nominating petition with the State Election Commission seeking to be the Fifth District's Congressional candidate. However, after receiving one or more "bona fide challenges," the Tennessee Republican Party ("TRP") suspended Starbuck's candidacy. Accordingly, Starbuck was notified in writing on April 11, 2022 that "**your candidacy was properly protested, and the State Executive Committee of the Tennessee Republican Party has recommended the suspension of your candidacy**. It was determined that your candidacy did not currently meet the bona fide standard of the Tennessee Republican Party." (Doc. No. 1, Ex. 9 at 1) (emphasis in original).

The letter then quoted the following language from Article IX of the TRP's Bylaws:

Section 1. The following shall be Party membership requirements for candidacy to public office. The TRP hereby defines the term "bona fide Republican," as:

A. Any individual who is actively involved in the Tennessee Republican Party, his County Republican Party, or any recognized auxiliary organization of either; and resides and is registered to vote in said county; and either

B. Any individual who has voted in at least three (3) of the four (4) most recent Statewide Republican primary elections; or

C. Any individual who is vouched for in writing (to the satisfaction of the decision makers defined herein) as a bona fide Republican by an officer of the TRP or a member of the CEC [County Executive Committee], excluding SEC members, of the County and/or District where said individual resides. The decision makers defined herein may require additional verification that said individual is indeed a bona fide Republican.

Id. The letter also quoted the Bylaws's provision that "[t]he final decision concerning said individual's bona fide Republican status shall be determined by a majority vote of the following: the State Chairman and each SEC [State Executive Committee] member who represents any portion of

2

the district covered by said individual's proposed candidacy." (Id.).

The TRP "assume[d]" that Starbuck would appeal and informed him he had seven days to either verify his voting record "or submit a 'vouch for' as described in Article IX[.]" (Id.). The TRP also informed Starbuck that if he could not "add sufficient information by April 21st, 2022," he would "be removed from the primary ballot." (Id.).

Starbuck alleges that by April 19, 2022, he had already "submitted evidence of hundreds of Tennessee voters, county GOP leaders, and national GOP politicians who vouched for his Republican bona fides." (Doc. No. 1, Cmpl. ¶ 38). This included written vouchers from nine CEC members from the Fifth Congressional District and the First Vice Chairman of the Williamson County Republican Party.

Starbuck further alleges that despite the large number of party loyalists willing to vouch for his Republican status and the TRP's receipt of hundreds of communications to that effect, a subcommittee of the SEC on April 19, 2022, in a closed door meeting without notice to him or the public, voted to remove his name from the primary ballot by a 16 to 13 vote. Accordingly, Scott Golden, Chairman of the TRP, instructed Mark Goins, the Coordinator of Elections, to remove Starbuck's name from the ballot for the upcoming Republican primary election in the Fifth District. (Cmpl. ¶ 11).

Starbuck claims on the same day as the vote, Goins spoke with him by phone and told him that no candidate had ever provided so many vouching letters and still been removed from the ballot. (Cmpl. ¶ 40). The next day, Golden publicly stated that Starbuck's removal was premised on his failure to have voted in the last four statewide primaries. If that were the real reason according to Starbuck, then the TRP got it wrong because of the disjunctive ("either") language in the Bylaws.

3

Furthermore, this explanation is inconsistent with what some of the committee members understood because, again according to Starbuck, subcommittee member Angie McClanahan indicated her vote to end his candidacy was based upon a newly-enacted Tennessee statute regarding residency that was not yet in effect. (Cmpl. ¶ 46).

Exactly why Mr. Starbuck's name was removed from the ballot the Court may never know. His Complaint speaks of smoke-filled rooms with carpetbaggers engaged in political chicanery reminiscent of the Daley machine in Chicago during the 60's and 70's, and New York's Tammany Hall in the late 1800's and early 1900's. Whatever the reason, the only question now is whether Mr. Starbuck is entitled to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. He is not.

## II. Application of Law

### A. Doctrine of Laches

Prior to discussing the well-known preliminary injunction factors, an initial issue needs to be addressed. In its response, Defendants argue that Starbuck's request for preliminary injunctive relief is barred by the doctrine of laches.

"In this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" United States v. City of Loveland, 621 F.3d 465, 473 (6th Cir. 2010) (quoting Elvis Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir.1991)). "'A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'" Id. (quoting Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc., 270 F.3d 298, 320 (6th Cir. 2001)). Whether the doctrine applies is subject to a court's discretion. Chirco v. Crosswinds Communities, Inc., 474 F.3d 227, 231 (6th Cir. 2007).

4

There is something to be said about Defendants' laches argument, particularly because Starbuck "waited until the eleventh hour to pursue his claims." Perry v. Judd, 471 F. App'x 219, 224 (4th Cir. 2012). After all, he was notified in writing on April 11, 2022 that his candidacy was being suspended, and the Coordinator of Elections was instructed by the TRP to remove his name from the ballot on that date. Further, he was definitively informed on April 19, 2022 that the TRP would not restore his name to the ballot. Nevertheless, he waited until May 2, 2022 to file his Complaint in this Court. The next day, he filed his request for injunctive relief, insisting that he needed a decision or hearing or both by May 6, 2022. This meant that the Court would have three days to consider the matter including his 44-page Complaint (that unquestionably took a long time to draft and finalize), and related filings and attachments. Meanwhile, Defendants were put in the position of having to scramble to respond to his request for an injunction.

Requests for temporary restraining orders and preliminary injunctions by their very nature are routinely emergency matters necessitating compressed time frames. However, "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction[.]" Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union, 471 F.2d 872, 876 (6th Cir. 1972) (citation omitted). Furthermore, in the election context, courts are reluctant to decide "constitutional questions presented without full briefing and argument and adequate opportunity for deliberation." O'Brien v. Brown, 409 U.S. 1, 4-5 (1972). Hence, "[i]t is well established that in election related matters, extreme diligence and promptness are required," Lyons v. City of Columbus, No. 2:20-CV-3070, 2020 WL 3396319, at *5 (S.D. Ohio June 19, 2020), and, "[a]s a general rule, last-minute injunctions changing election procedures are strongly

5

disfavored." SEIU Local 1 v. Husted, 698 F.3d 341, 345 (6th Cir. 2012). Nevertheless, the Court will not deny Starbuck's request for an injunction on the grounds that he waited too long to file suit.

**B. Preliminary Injunction Factors**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). In deciding whether to grant an injunction pending a trial on the merits, the Court must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." Louisiana-Pacific Corp. v. James-Hardie Bldg. Prods., Inc., 928 F.3d 514, 517 (6th Cir. 2019) accord Bays v. City of Fairborn, 668 F.3d 814, 818–19 (6th Cir. 2012); Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005). "'These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together.'" Northeast Ohio Coalition for Homeless and Service Employees v. Blackwell, 467 F.3d 999, 1009 (6th Cir.2006) (quoting Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 152 (6th Cir. 1991)). Thus, the Court "'is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir.2007) (quoting Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir.2003)).

**1. Likelihood of Success on the Merits**

The likelihood of success on the merits is obviously tied to the claims alleged. Here, Starbuck brings three claims under 42 U.S.C. § 1983. In his First Claim, he alleges a violation of

6

the Qualifications Clause of Article I of the United States Constitution; in his Second Claim he asserts a procedural due process violation under the Fourteenth Amendment; and in his Third Claim he alleges interference with his First Amendment Rights. In Claims Four through Six, respectively, Starbuck alleges state law claims, arising mostly from application of the Party's Bylaws, for violation of Tennessee's Open Meeting Act ("TOMA"); breach of contract; and promissory estoppel.

Starbuck argues in his brief that if the Court finds that he "is likely to succeed on just one of his claims, then he is entitled to the relief sought by this motion." (Doc. No. 11 at 2). He insists that "all this Court need hold to grant relief Starbuck requests is that the Party Defendants breached a contract with Starbuck by, and were estopped from, directing the State Defendants to remove his name from the election ballot, because doing so violated the plain terms of the Party's Bylaws on which Starbuck relied to his detriment." (Id.). This is not necessarily so for two reasons.

First, and as already noted, the preliminary injunction factors are to be balanced although, admittedly, "[i]n constitutional cases, the first factor is typically dispositive" because "'[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed.'" Vitolo v. Guzman, 999 F.3d 353, 360 (6th Cir. 2021) (quoting Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012)). The same cannot be said for pedestrian state law claims.

The notion that there exists a "constitutional case" leads to the second reason: Starbuck's reliance on supplemental jurisdiction and whether he is essentially using a "federal tail to wag what is in substance a state dog." De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003). Federal courts have limited jurisdiction but may exercise supplemental jurisdiction over "all other claims that are so related to the claims . . . within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

7

Nevertheless, a federal court may decline to exercise supplemental jurisdiction over a claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Id. § 1367(c)(2). The Court may also consider other factors when determining whether to exercise supplemental jurisdiction, "including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims." City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 173 (1997).

As will become even more apparent in the discussion below, Starbuck's federal claims appear to be but an appendage to his state law claims, and a small one at that. A fair reading of his Complaint makes clear that his real bone of contention is with how the TRP allegedly misconstrued or intentionally misapplied its own Bylaws. Indeed, at oral argument, his counsel recognized this to be true when his very first statement was that the "real question" presented in this case was whether the TRP followed its own rules. It rejected his candidacy purportedly on the basis that Starbuck had not voted in the minimum number of statewide election, even though the Bylaws allow others to vouch for a candidate's party status as an alternative.

Starbuck alleges that "[i]n reliance on the law and the Bylaws of the TRP, [he] invested heavily in his membership in the Republican Party and his candidacy, devoting extensive time and efforts to supporting the Party's efforts and seeking its nomination." (Doc. No. 1, Cmpl. ¶ 73). Starbuck's efforts were thwarted not because of any clear violation of federal law, but because (for whatever reason) the TRP decided not to follow its own rules. His predominant claims, then, are that

the TRP breached an enforceable contract when it failed to follow its Bylaws, and he relied to his detriment on the TRP's promise to allow candidates who met certain eligibility requirement to run in the primary election.

Starbuck's response brief confirms this Court's reading of the Complaint. He states that "Tennessee law does **not** commit the State to enforcing party insider preferences, additional substantive qualifications for federal office not enumerate in the Constitution, or other extraneous factors not specified in law." (Doc. No. 30 at 1) (emphasis in original). He also complains that the decision to remove him from the ballot "was made for multiple reasons other than the *sole* reason permitted by state law and the TRP's Bylaws," and that the TRP's action in doing so was "plainly *ultra vires*." (Id. at 1-2). Further, while professing to "not [be] asking this Court to make a political decision," he "asks the Court to uphold the clear requirements of state law and the TRP's Bylaws that unambiguously entitle him to seek voter approval." (Id. at 6).

Given Starbuck's allegations, and "given that [the] ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" are in the court's discretion, Union Home Mortg. Corp. v. Cromer, 31 F.4th 356, 366 (6th Cir. 2022), the Court will not issue an injunction based on state law claims that it may not retain, particularly when the federal claims are already the subject of a motion to dismiss (Doc. No. 15). See Kowall v. Benson, 18 F.4th 542, 549 (6th Cir. 2021) ("[W]hen a federal court dismisses all pending federal claims before trial, . . . it is usually best to allow the state courts to decide state issues."). Accordingly, the Court finds it appropriate to consider only whether Starbuck has shown a likelihood of success based on any one or more of the three Section 1983 claims that serve as the basis for this Court's original jurisdiction.

9

### (a) Qualification Clause Claim

The Constitution sets forth the qualifications for membership in the Congress of the United States by providing: "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." Article I, § 2, cl. 2. These qualifications, and those for United States Senators set forth in the next section of Article I, are part of the "fundamental principle of our representative democracy," and can only be changed by an amendment. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 783 (1995). That is, "[t]he qualifications of the persons who may choose or be chosen . . . are defined and fixed in the Constitution, and are unalterable by the legislature," and most certainly unalterable by state legislation or a political party. Powell v. McCormack, 395 U.S. 486, 537 (1969) (citation omitted).

It might be a problem if Tennessee required that Starbuck be a resident of Tennessee for a period of time in order to be elected, as California required for its Congressional candidates. Schaefer v. Townsend, 215 F.3d 1031, 1034 (9th Cir. 2000) (finding unconstitutional a state statue requiring that its candidates be a registered voter requiring a minimum of 29 days residence in a voting precinct). Similarly, it might be a problem if the TRP found Starbuck ineligible because he was a resident of another state when his candidacy paperwork was filed in light of the "when elected" language in Article I, Section 2, clause 2. Texas Democratic Party v. Benkiser, 459 F.3d 582, 590 (5th Cir. 2006) (finding violation of Elections Clause where Texas political party found incumbent congressional candidate ineligible because he was residing in Virginia).

However, neither is the situation here. True, the Tennessee legislature recently passed legislation (S.B. 2616; H.B. 2764) requiring Congressional candidates be residents of this state for

10

at least three years, but a direct challenge to that legislation, signed by the Governor, was filed in a case styled Collins v. State of Tenn., Case No. 3:22-cv-225 (M.D. Tenn. March 31, 2022) that is pending before Judge Eli Richardson. The new residency requirement, however, is inapplicable here because it did not take effect until April 13, 2022, which was after the April 7, 2022 filing deadline for congressional candidates to be on this year's ballot.

Instead, Starbuck asserts that "[t]he TRP's decision to disqualify [him] is essentially a camouflaged residency requirement, which it arrive[d] at by a contorted, arbitrary application of its authority to limit primary candidates to bona fide party members." (Doc. No. 1 Cmpl. ¶ 61). As support, he points to McClanahan's alleged statement that she believed she was bound by Tennessee's newly-enacted residency requirement when voting to sustain the challenge to Starbuck's Republican status. (Id. ¶ 64).

The problem with Starbuck's argument is at least two-fold. First, as it pertains to the TRP and Golden, there is a serious question as to whether they are state actors, even though "state action" (or under color of state law) is an essential element of any Section 1983. Parratt v. Taylor, 451 U.S. 527, 535 (1981). This alone is cause for caution and reflection under the circumstances presented here. As Judge Robert L. Echols observed in the context of a Democratic primary challenge:

> When faced with a request by a party contestant to change the decision of the party's State Primary Board after completion of its own deliberative process, the federal court should tread lightly. Such cases brought before the federal courts seeking intervention in political party decision-making require the courts to consider a multitude of competing interests:
>
>> [T]hese cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. Highly important questions are presented concerning justiciability, whether the action of the [political party] is state action, and if so the reach of the Due Process Clause in this unique context.

11

Kurita v. State Primary Bd. of Tennessee Democratic Party ("Kurita I"), No. 3:08-0948, 2008 WL 4601574, at *5 (M.D. Tenn. Oct. 14, 2008) (quoting O'Brien, 409 U.S. 1, 5 (1972)). Judge Echols then went on to discuss in detail why members of the Tennessee Democratic Party were not state actors under the "public function," "state compulsion," or the "symbiotic relationship"/"nexus" tests. Because (1) Judge Echols' decision was affirmed on appeal (albeit in an unpublished opinion) with the observation that it was based on "well-settled law" and his "order and opinion correctly sets out the applicable law under § 1983," Kurita v. State Primary Bd. of Tennessee Democratic Party ("Kurita II"), 472 F. App'x 398, 398–99 (6th Cir. 2012), and (2) Starbuck has pointed to no intervening change in controlling law that requires a different conclusion, Starbuck cannot show a substantial likelihood of success on his Section 1983 claim against the TRP and Goins.

Second, and as to all Defendants, whether Starbuck is truly a bona fide Republican has nothing to do with his qualifications under Article I, § 2, cl.2 of the Constitution. That is, the TRP's decision will not change or add to the requirement that Starbuck be at least 25, a citizen of the United States for seven years, and a resident of Tennessee when he is elected, should Tennessee voters so choose.

"The Party's ability to define who is a 'bona fide Democrat' is nothing less than the Party's ability to define itself." LaRouche v. Fowler, 152 F.3d 974, 996 (D.C. Cir. 1998). "Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to 'identify the people who constitute the association,' and to select a 'standard bearer who best represents the party's ideologies and preferences.'" Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 224 (1989) (quoting Ripon Serv. In v. Nat'l Republican Party, 525 F.2d 567, 601 (D.C. Cir. 1975)).

12

Furthermore, even if some committee persons believed they were bound by the new legislation, and even if others voted against Starbuck's candidacy because he was a newcomer to Tennessee or they did not like him, the fact remains the TRP's Bylaws do not require a fixed period of residency in order to be placed on the ballot. As Starbuck recognizes, the Bylaws are written in the disjunctive: a candidate must have voted in three of the last four statewide Republican primaries, *or* be vouched for in writing. That the TRP or one or more of the subcommittee members may not have followed the Bylaws sounds in breach of contract or suggests a promissory estoppel claim, not a Qualification Clause claim. As such, Starbucks has not shown a substantial likelihood of success on his First Claim for relief.

### (b) Due Process Claim

Starbuck has also not established a likelihood of success on his procedural due process claim. "In order to establish [such a] claim, the plaintiffs must show that (1) they had life, liberty, or property interests protected by the Due Process Clause; (2) they were deprived of these protected interests; and (3) the state did not afford them adequate procedural rights." Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir.2006). Of course, in the absence of a protected interest, the adequacy or inadequacy of procedures is irrelevant. Wilkinson v. Austin, 545 U.S. 209, 221 (2005); Thompson v. Ashe, 250 F.3d 399, 407 (6th Cir. 2001).

Starbuck alleges that the "right to run in the Republican primary in Tennessee's 5th Congressional District is a liberty interest protected by the Fourteenth Amendment." (Cmpl ¶ 74). The weight of the law is to the contrary.

In Snowden v. Hughes, 321 U.S. 1, 7 (1944), the Supreme Court held that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of

13

liberty secured by the due process clause." Since then, the lower courts have repeatedly held that a candidate for political office holds no property or liberty interest in an elected position. See Chase v. Senate of Virginia, 539 F. Supp. 3d 562, 569 (E.D. Va. 2021) (relying on Snowden and stating "[i]t is difficult to see how a right to seniority could exist if there is no underlying right to hold public office"); Durham v. Eley, 507 F. Supp. 3d 956, 965 (M.D. Tenn. 2020) (relying on Snowden and observing that ever since the Supreme Court first stated in Taylor v. Beckham, 178 U.S. 548, 576 (1900) that public office is not property, "it has never backed away from that decision"); Kurita, 2008 WL 4601574 at *13 (collecting cases for the proposition that candidate cannot state a procedural due process claims because she lacked a constitutionally protected interest in elected office); Farquharson v. Lafayette, No. 19-CV-3446 (NSR), 2020 WL 1699985, at *8 (S.D.N.Y. Apr. 7, 2020) (same).

The Court recognizes that Snowden was written almost three-quarters of a century ago and some "modern courts have questioned" its continued validity "because the Supreme Court has greatly expanded the range of constitutionally protected interests since Snowden[.]" Abrahamson v. Neitzel, 120 F. Supp. 3d 905, 920–21 (W.D. Wis. 2015). However, as the court in Abrahamson recognized, and as the Second and Fifth Circuit have explained, while "intervening cases may cast a shadow over . . . Snowden, 'it is the Supreme Court's prerogative alone to overrule one of its precedents.'" Wilson v. Birnberg, 667 F.3d 591, 598 (5th Cir. 2012) (quoting Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005)). The Court is not about to reach a contrary conclusion based merely upon Starbuck's citation to dicta in Miller v. Lorain Cnty. Bd. of Elections that (1) "whether an individual has a constitutionally protected interest in becoming a candidate for public office is not clear"; and (2) its statement in a corresponding footnote that "candidacy may involve some level of a protected

14

property or liberty interest." 141 F.3d 252, 260 & n.8 (6th Cir. 1998).

### *(c) First Amendment Claim*

For many of the reasons already discussed, Starbuck has not shown a substantial likelihood of success on his First Amendment claim, either. This includes the question of whether there exists state action within the meaning of Section 1983 for purposes of his claim against the TRP and Golden.

The First Amendment prohibits States from enforcing laws "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957).

"The right of individuals to associate in political organizations, and the right of citizens to cast a meaningful vote, are among the most important values in our democracy." Green Party of Tennessee v. Hargett, 767 F.3d 533, 545 (6th Cir. 2014) (citing Williams v. Rhodes, 393 U.S. 23, 30 (1968)). "Like most rights, however, the candidates' First Amendment rights are not absolute." Krislov v. Rednour, 226 F.3d 851, 858–59 (7th Cir. 2000) (citing Burdick v. Takushi, 504 U.S. 428, 433 (1992)). To the contrary, "states may impose reasonable restrictions on ballot access to ensure that political candidates can show a 'significant modicum of support' from the public, and to avoid 'election- and campaign-related disorder.'" Green Party, 767 F.3d at 545. "State restrictions on ballot access therefore 'are not automatically subjected to heightened scrutiny.'" Id. (quoting Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 585 (6th Cir. 2006)).

The membership requirements for a political party are "for the association and its members

15

to decide—not the courts—so long as those requirements are otherwise constitutionally permissible." Munro v. Socialist Workers Party, 479 U.S. 189, 193 n.25 (1986). Put differently, "a State, or a court, may not constitutionally substitute its own judgment for that of the Party." Id.

By statute, Tennessee leaves it to the executive committee of a party to determine who is qualified and whose name shall be placed on a primary ballot. Tenn. Code Ann. §§ 2-5-204; 2-13-104. To that end, the TRP enacted rules for determining who is a bona fide Republican, including the requirement that either the individual has consistently voted in statewide Republican primaries for the past few year, or has been acceptably vouched for.

Again, the essence of Starbuck's claim is that the TRP ignored its own rules that are based upon the delegation of powers conferred to it by state law. However, Section 1983 does not provide redress for state law violations, Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995); remedy noncompliance with state administrative procedures, Boswell v. Mayer, 169 F.3d 384, 390 (6th Cir. 1999), or cover "the deprivation of state procedural rights," Mills v. Cnty. of Lapeer, 498 F. App'x 507, 514 (6th Cir. 2012). See Manley v. Law, 889 F.3d 885, 889 (7th Cir. 2018) ("The Constitution does not guarantee good feelings or regulate manners in political disputes."); Raila v. Cook Cnty. Officers Electoral Bd., No. 19 C 7580, 2021 WL 5179913, at *4 (N.D. Ill. Nov. 8, 2021) (noting that "the reticence of federal courts to intrude on state election matters is well established" and that this reticence "has led to a general hands-off approach in cases involving the 'dirty tricks' inherent in politics"); Oliver v. Lewis, 891 F. Supp. 2d 839, 849 (S.D. Tex. 2012) (noting that whether defendant followed Democratic party's rules or state election code were state-law issues); Wolfe v. Arkansas Democratic Party, No. 4:12CV00314 JMM, 2012 WL 3776476, at *2 (E.D. Ark. Aug. 30, 2012) (dismissing complaint where allegation was that state Democratic Party violated its own

16

rules). Accordingly, Starbuck has not shown a substantial likelihood of success on his First Amendment claim.

**B. Irreparable Harm to Plaintiff**

Starbuck insists he "will suffer irreparable harm as he will be unable to run in the Republican primary for Tennessee's 5th Congressional," and this harm is compounded because the April 7, 2022 deadline for filing nominating petitions passed before the TRP decision at issue became final. (Doc. No. 8 at 23). In support he, cites Esshaki v. Whitmer for the proposition that "[b]allot access cases such as this implicate First Amendment rights, and when such fundamental rights are violated–as when a candidate is unconstitutionally deprived of access to the ballot–irreparable harm can be presumed." 455 F. Supp. 3d 367, 379 (E.D. Mich.).

Esshaki, however, is inapposite because it dealt with Michigan's refusal to waive the one-thousand signatures requirement for candidates desiring to have their names placed on the ballot, even though the state itself had issued mandatory stay-at-home requirements due to the COVID-19 pandemic. More importantly, that case is distinguishable because there was clearly state action, something that is far from clear here. While the court recognized that " there is no fundamental right to run for elective office," it also found that the "reality . . . for Plaintiff and other candidates [was] that state action has pulled the rug out from under their ability to collect signatures." Id. at 377. The "reality" here is that Tennessee and its state actors have done no such thing. Instead, assuming Starbuck's allegations are true, the TRP may have misapplied its own Bylaws.

**C. Substantial Harm to Others**

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" Certified Restoration, 511 F.3d at 550–51. The Court believes

17

rules). Accordingly, Starbuck has not shown a substantial likelihood of success on his First Amendment claim.

**B. Irreparable Harm to Plaintiff**

Starbuck insists he "will suffer irreparable harm as he will be unable to run in the Republican primary for Tennessee's 5th Congressional," and this harm is compounded because the April 7, 2022 deadline for filing nominating petitions passed before the TRP decision at issue became final. (Doc. No. 8 at 23). In support he, cites Esshaki v. Whitmer for the proposition that "[b]allot access cases such as this implicate First Amendment rights, and when such fundamental rights are violated–as when a candidate is unconstitutionally deprived of access to the ballot–irreparable harm can be presumed." 455 F. Supp. 3d 367, 379 (E.D. Mich.).

Esshaki, however, is inapposite because it dealt with Michigan's refusal to waive the one-thousand signatures requirement for candidates desiring to have their names placed on the ballot, even though the state itself had issued mandatory stay-at-home requirements due to the COVID-19 pandemic. More importantly, that case is distinguishable because there was clearly state action, something that is far from clear here. While the court recognized that " there is no fundamental right to run for elective office," it also found that the "reality . . . for Plaintiff and other candidates [was] that state action has pulled the rug out from under their ability to collect signatures." Id. at 377. The "reality" here is that Tennessee and its state actors have done no such thing. Instead, assuming Starbuck's allegations are true, the TRP may have misapplied its own Bylaws.

**C. Substantial Harm to Others**

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" Certified Restoration, 511 F.3d at 550–51. The Court believes

17

that the harm to others is potentially two-fold.

First, if this Court were to issue an injunction requiring that Starbuck's name be placed on the ballot, there is a strong likelihood that one or more Defendants would appeal and the issue would remain in limbo. Because of the timetable for finalizing the ballot and preparing those that need to be mailed to absentee voters is fast approaching, this possibility "could have a significant detrimental impact on the work of [the] state and county officials, risk voter confusion, and potentially compromise[] the integrity of [the primary] election." Moore v. Lee, No. M202200434SCRDOCV, 2022 WL 1101833, at *4 (Tenn. Apr. 13, 2022).

Second, entering an injunction when a plaintiff fails to establish a substantial likelihood of success on the merits is particularly problematic in the political arena. As the Supreme Court has observed:

> In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views.
>
> Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party "select[s] a standard bearer who best represents the party's ideologies and preferences."

California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) (internal citations omitted).

**D. The Public Interest**

The last factor in determining whether to grant a preliminary injunction "asks whether the public interest is advanced in issuing" the order. National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club, 372 F.3d 712, 720 n.4 (6th Cir. 2003). Starbuck argues:

18

> The public interest weighs strongly in favor of a preliminary injunction, which would protect [his] constitutional rights and uphold the legitimacy of Tennessee's elections. First, "[i]t is always in the public interest to prevent violation of a party's constitutional rights." Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., 274 F.3d 377, 400 (6th Cir. 2001) (internal quotation marks omitted). Second, "the public has a 'strong interest in exercising the fundamental political right to vote.'" Obama for Am. v. Husted, 697 F.3d 423, 437 (6th Cir. 2012) (quoting Purcell v. Gonzalez, 549 U.S. 1, 4 (2006)). The public is deprived of that right when party insiders are permitted to subvert the democratic process by removing a candidate from a primary election in contravention of state law and the TRP's Bylaws.

(Doc. No. 8 at 25). Starbuck also asserts that "[t]he purpose of this lawsuit is to prevent the TRP from violating the United States Constitution, TOMA, and its own Bylaws." (Id. at 24).

The Court certainly agrees that upholding the Constitution is in the public's interest. But, as confirmed by the foregoing and as stated at the outset, Starbuck's complaint isn't so much a complaint that the Constitution has been violated, but his "real question" is whether the TRP did not treat him fairly in accordance with its rules. On the other hand, the right of a party to choose its flag-bearer is of significant importance not only to the party, but also to the public as a whole. This factor is neutral at best.

### III. Conclusion

On the basis of the foregoing, Starbuck's Amended Motion for a Preliminary Injunction will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE